**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | **CIVIL ACTION NO.** |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **COMPLAINT** |
| T-N-T OF YORK COUNTY, INC., and TM TRUCKING OF THE CAROLINAS, LLC, | ) ) ) ) | **JURY TRIAL DEMAND** |
| **Defendants.** | ) ) | |

NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of race, black, and to provide appropriate relief to Rodney Dunlap ("Dunlap"), Warren Chisolm ("Chisolm"), and other similarly situated current and former black employees who were adversely affected by such practices. Plaintiff, the U.S. Equal Employment Opportunity Commission ("the Commission"), alleges Defendants T-N-T of York County, Inc. and TM Trucking of the Carolinas, LLC (collectively "Defendants") subjected Dunlap, Chisolm, and other similarly situated current and former black employees to a racially hostile work environment based on their race, black. The Commission further alleges that Dunlap, Chisolm, and some of the other similarly situated current and former black employees resigned their employment as a result of the racially hostile work environment.

1

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(f)(1) and (3) ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of South Carolina.  This lawsuit is being filed in the Rock Hill Division because a substantial part of the events or omissions giving rise to the claims alleged in this suit occurred within the Rock Hill Division.

## PARTIES

3.      Plaintiff, the U.S. Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII, and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §2000e-5(f)(1) and (3).

4.      At all relevant times, Defendant T-N-T of York County, Inc. ("Defendant T-N-T") has been a South Carolina corporation, doing business in the state of South Carolina, and the city of Rock Hill.

5.      At all relevant times, Defendant TM Trucking of the Carolinas, LLC ("Defendant TM Trucking") has been a South Carolina corporation, doing business in the state of South Carolina, and the city of Rock Hill.

6.      On information and belief, at all relevant times Defendant T-N-T has had at least 15 employees on a continual basis.

7.    On information and belief, at all relevant times the two Defendants named in this action have operated as an integrated business enterprise, and have collectively had at least 15 employees on a continual basis.

8.    Facts establishing the existence of an integrated enterprise include, but are not limited to, the following:

   a. Defendants are wholly owned by the same individual;

   b. Defendants share a common physical address, 605 Albright Road, Rock Hill, South Carolina 29730;

   c. Defendants share a common mailing address, P.O. Box 1986, Fort Mill, South Carolina 29730;

   d. Defendants' operations are interrelated as Defendants operate out of the same facility and on information and belief share employees;

   e. On information and belief Defendants have common financial control;

   f. At all relevant times, Defendants shared common management;

   g. Defendant TM Trucking performs all payroll services for Defendant T-N-T; and

   h. Centralized control of labor for Defendants rests with the Defendants' owner.

9.    At all relevant times, both Defendants named in this action have continuously been employers engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g), and (h).

## STATEMENT OF CLAIMS – RODNEY DUNLAP

10.   More than thirty days prior to the institution of this lawsuit, Rodney Dunlap ("Dunlap") filed a charge with the Commission alleging Defendants[1] violated Title VII.

---

[1] Dunlap's charge identified Defendants by the generic name "TNT Trucking" as the respondent in the charge.

11. On September 30, 2015, the Commission issued to Defendants a Letter of Determination finding reasonable cause to believe that Defendants violated Title VII, and inviting Defendants to join with the Commission in informal methods of conciliation to endeavor to eliminate the discriminatory practices and provide appropriate relief.

12. The Commission engaged in communications with Defendants to provide Defendants the opportunity to remedy the discriminatory practices described in the Letter of Determination.

13. The Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

14. On December 29, 2015, the Commission issued to Defendants a Notice of Failure of Conciliation.

15. All conditions precedent to the initiation of this lawsuit have been fulfilled.

16. Throughout Dunlap's employment with Defendants from approximately June 2013 through January 25, 2014, Defendants engaged in unlawful employment practices at their joint facility in Rock Hill, South Carolina (the "Facility"), in violation of Section 703(a)(1) of Title VII, 42 U.S.C. §2000e-2(a)(1) as set forth below. Specifically, Defendants discriminated against Dunlap by subjecting him to severe or pervasive conduct that created a hostile work environment based on his race, black.

17. During Dunlap's employment, Defendants' owner (the "Owner") referred to blacks as "nigger" in statements made at the Facility.

18. During Dunlap's employment, the Owner referred to Dunlap as "nigger."

19. During Dunlap's employment, the Owner referred to other blacks as "nigger" in Dunlap's presence.

4

20.     During Dunlap's employment, the Owner used the term "nigger" in reference to blacks in the presence of employees other than Dunlap.

21.     During Dunlap's employment, the Owner referred to blacks by the term "nigger" frequently, a minimum of one or two times per week.

22.     During Dunlap's employment, the Owner openly used the term "nigger" in speaking about blacks at the Facility.

23.     During Dunlap's employment, the Owner frequently made other derogatory remarks about black people while at the Facility, a minimum of one or two times per week.

24.     For example, the Owner used the term "nigger" in Defendants' break room in or around early July 2013 while Dunlap, the Owner, and a group of black employees were sitting in the break room having a conversation.

25.     Dunlap excused himself from the break room conversation because he was offended by the Owner's use of the term "nigger."

26.     In or around August 2013, the Owner referred to a Native American employee as "Indian nigger."

27.     Dunlap was sitting in Defendants' break room and heard the Owner make the comment identified in paragraph 26 (above).

28.     In or around September 2013, the Owner referred to Warren Chisolm as a "country ass nigger" while talking to Dunlap.

29.     In response to the Owner's statement noted in paragraph 28 (above), Dunlap asked the Owner why it was necessary for him to refer to blacks as "niggers." The Owner responded to Dunlap that the term "nigger" refers to an ignorant person.

30.     In addition to referring to blacks as "nigger," the Owner told Dunlap that

monkeys could drive better than the black drivers who worked for Defendants.

31. The Owner never made similar remarks about the driving abilities of white employees.

32. Dunlap heard the Owner's racially derogatory comments about blacks at least one or two times per week throughout his employment. The Owner's racially offensive comments about blacks were unwelcome to Dunlap. Dunlap was offended by the Owner's continuous use of the term "nigger" and his derogatory remarks about black people.

33. Defendants are strictly liable for the racially hostile work environment that Dunlap was subjected to because it was created and perpetrated by Defendants' Owner.

34. Defendants constructively discharged Dunlap. Specifically, on or about January 25, 2014, Dunlap resigned his employment with Defendants because he could no longer tolerate the racially hostile work environment created by Defendants' Owner.

35. The effect of the practices complained of above has been to deprive Dunlap of equal employment opportunities and otherwise adversely affect his status as an employee because of his race, black.

36. The unlawful employment practices complained of above were intentional.

37. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Dunlap.

## STATEMENT OF CLAIMS – WARREN CHISOLM

38. More than thirty days prior to the institution of this lawsuit, Warren Chisolm ("Chisolm") filed a charge with the Commission alleging Defendants[2] violated Title VII.

39. On September 30, 2015, the Commission issued to Defendants a Letter of Determination finding reasonable cause to believe that Defendants violated Title VII, and

---

[2] Chisolm's charge identified Defendants by the generic name "TNT Trucking" as the respondent in the charge.

inviting Defendants to join with the Commission in informal methods of conciliation to endeavor to eliminate the discriminatory practices and provide appropriate relief.

40. The Commission engaged in communications with Defendants to provide Defendants the opportunity to remedy the discriminatory practices described in the Letter of Determination.

41. The Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

42. On December 29, 2015, the Commission issued to Defendants a Notice of Failure of Conciliation.

43. All conditions precedent to the initiation of this lawsuit have been fulfilled.

44. Starting approximately two months after Chisolm began his employment with Defendants in or around April 2013, through sometime in June 2014 when Chisolm resigned his employment, Defendants engaged in unlawful employment practices at the Facility in violation of Section 703(a)(1) of Title VII, 42 U.S.C. §2000e-2(a)(1) as set forth below. Specifically, Defendants discriminated against Chisolm by subjecting him to severe or pervasive conduct that created a hostile work environment based on his race, black.

45. During Chisolm's employment, the Owner referred to blacks as "nigger" in statements made at the Facility.

46. During Chisolm's employment, the Owner referred to Chisolm as a "country ass nigger."

47. During Chisolm's employment, the Owner referred to other blacks as "nigger" in Chisolm's presence.

48. During Chisolm's employment, the Owner used the term "nigger" in reference to

blacks in the presence of employees other than Chisolm.

49. During Chisolm's employment, the Owner openly used the term "nigger" in speaking about blacks at the Facility.

50. For example, in or around June 2013, the Owner asked Chisolm and other black employees why "niggers" think they are so smart.

51. During Chisolm's employment, the Owner referred to blacks by the term "nigger" at least five or six times.

52. During Chisolm's employment, the Owner made other derogatory remarks about black people at least once or twice per week.

53. The derogatory comments that the Owner made about black people included such things as saying that black people can't read or write or saying that black people always want things for free.

54. Chisolm heard the Owner refer to blacks by the term "nigger" at least five or six times and make derogatory remarks about black people at least once or twice per week throughout his employment. The Owner's racially offensive comments about blacks were unwelcome to Chisolm. Chisolm was offended by the Owner's use of the term "nigger" and by the Owner's derogatory remarks about black people.

55. Defendants are strictly liable for the racially hostile work environment that Chisolm was subjected to because it was created and perpetrated by Defendants' Owner.

56. Defendants constructively discharged Chisolm. Specifically, in or around June 2014, Chisolm resigned his employment with Defendants because he could no longer tolerate the racially hostile work environment created by Defendants' Owner.

57. The effect of the practices complained of above has been to deprive Chisolm of equal employment opportunities and otherwise adversely affect his status as an employee because of his race, black.

58. The unlawful employment practices complained of above were intentional.

59. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Chisolm.

STATEMENT OF CLAIMS – CLASS ALLEGATIONS

60. In addition to the allegations above, Defendants have subjected other similarly situated current and former black employees to unwelcome, severe or pervasive conduct that created a racially hostile work environment at the facility based on their race, black.

61. The Owner openly used the term "nigger" to and in the presence of black employees.

62. From at least September 2010 through at least July 2014, the Owner sometimes referred to black people using the term "nigger" when talking to or about black people at the facility.

63. Some of the black employees who were subjected to the Owner's use of the term "nigger" and other racial slurs resigned because of the racially hostile work environment.

64. The paragraphs below contain the general allegations related to similarly situated current and former black employees known to the Commission at the time of the filing of this Complaint. The Commission specifically reserves the right to identify additional current and former black employees as claimants in this litigation. The similarly situated current and former black employees are collectively referred to as "Class Claimants."

## BURSHA DUMAS

65. Bursha Dumas ("Dumas") was employed by Defendants from on or about May 23, 2014 through on or about July 5, 2014.

66. During Dumas' employment, the Owner used the term "nigger" on a daily basis, several times per day at Defendants' Facility.

67. Dumas heard the Owner use the term "nigger" on a daily basis, several times per day, throughout his employment. The Owner's use of the term "nigger" was unwelcome to Dumas. Dumas was offended by the Owner's use of the term "nigger."

68. Defendants constructively discharged Dumas. Specifically, on or about July 5, 2014, Dumas resigned his employment with Defendants because he could no longer tolerate the racially hostile work environment created by Defendants' Owner.

## BERNARD ELAM

69. Bernard Elam ("Elam") was employed by Defendants from approximately September 2010 through December 7, 2013.

70. During Elam's employment, the Owner used the term "nigger" on a daily or almost daily basis.

71. During Elam's employment, Elam heard the Owner use the term "nigger" in his presence on a daily or almost daily basis. The Owner's use of the term "nigger" was unwelcome to Elam. Elam was offended by the Owner's use of the term "nigger."

72. Defendants constructively discharged Elam. Specifically, on or about December 7, 2013, Elam resigned his employment with Defendants because he could no longer tolerate the racially hostile work environment created by Defendants' Owner.

### KEVIN GOOD

73. Kevin Good ("Good") was employed by Defendants for approximately three months in late 2012, and from approximately November 2013 through on or about June 21, 2014.

74. During Good's employment, the Owner used the term "nigger" on an almost daily basis.

75. During Good's employment, the Owner directly referred to Good as "nigger" at least one occasion.

76. Good heard the Owner use the word "nigger" on an almost daily basis. The Owner's use of the term "nigger" was unwelcome to Good. Good was offended when the Owner called Good "nigger," and by the Owner's use of the term "nigger" in reference to black people.

77. During Good's employment, Good told the Owner on more than one occasion that he did not appreciate the Owner's use of the term "nigger."

78. Defendants constructively discharged Good. Specifically, on or about June 21, 2014, Good resigned his employment with Defendants because he could no longer tolerate the racially hostile work environment created by Defendants' Owner.

### ROBERT LITTLEJOHN

79. Robert Littlejohn ("Littlejohn") was employed by Defendants from on or about June 27, 2012 through in or around April 2014.

80. During Littlejohn's employment, the Owner used the term "nigger" at least eight to 10 times.

81.     Littlejohn heard the Owner use the term "nigger" at least eight to ten times. The Owner's use of the term "nigger" was unwelcome to Littlejohn. Littlejohn was offended by the Owner's use of the term "nigger."

82.     Defendants constructively discharged Littlejohn. Specifically, in or around April 2014, Littlejohn resigned his employment with Defendants because he could no longer tolerate the racially hostile work environment created by Defendants' Owner.

## JOE NEAL

83.     Joe Neal ("Neal") was employed by Defendants from approximately May 29, 2012 through May 11, 2013.

84.     During Neal's employment, the Owner called an employee "nigger" or referred to an employee as "nigger" in Neal's presence on an almost daily basis.

85.     During Neal's employment, the Owner directly called Neal "nigger" on at least one occasion.

86.     The Owner referred to Neal as "nigger" over the phone when Neal called to report an issue with his truck while out on a delivery.

87.     Neal told the Owner to never call him "nigger" again.

88.     During Neal's employment, Neal heard the Owner use the term "nigger" at Defendants' Facility over 80 times in reference to black employees and blacks in general. The Owner's use of the term "nigger" and was unwelcome to Neal. Neal was offended by the Owner's use of the term "nigger" and other racial slurs.

89.     Defendants constructively discharged Neal. Specifically, on or about May 11, 2013, Neal resigned his employment with Defendants because he could no longer tolerate the racially hostile work environment created by Defendants' Owner.

## LIABILITY FOR CLASS CLAIMANTS

90.     Defendants are strictly liable for the racially hostile work environment to which the Class Claimants and all other similarly situated current and former black employees were subjected, because it was perpetrated by Defendants' owner.

91.     The effect of the practices complained of above has been to deprive the Class Claimants and all similarly situated current and former black employees of equal employment opportunities and otherwise adversely affect their status as employees because of their race, black.

92.     The unlawful employment practices complained of above were intentional.

93.     The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of the above-named Class Claimants and all similarly situated current and former black employees.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Defendants, its officers, successors, assigns, and all persons in active concert or participation with them, from maintaining a racially hostile work environment, and from retaliating against employees who oppose unlawful discrimination, make a charge of unlawful discrimination, or participate in an investigation of unlawful discrimination.

B.     Order Defendants to institute and carry out policies, practices, and programs that provide equal employment opportunities for black employees, and which eradicate the effects of its past and present unlawful employment practices.

C.	Order Defendants to make whole Dunlap, Chisolm, the above-named Class Claimants, and all other similarly situated current and former black employees subjected to Defendants' racially hostile work environment, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial.

D.	Order Defendants to make whole Dunlap, Chisolm, the above-named Class Claimants, and all other similarly situated current and former black employees subjected to Defendants' racially hostile work environment, by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices described above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, loss of self-esteem and loss of civil rights, in amounts to be determined at trial.

E.	Order Defendants to make whole Dunlap, Chisolm, the above-named Class Claimants, and all other similarly situated former black employees who Defendants constructively discharged as a result of the racially hostile work environment, by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of the unlawful employment practices, including but not limited to reinstatement or front pay.

F.	Order Defendants to pay punitive damages to Dunlap, Chisolm, the above-named Class Claimants, and all other similarly situated current and former black employees subjected to Defendants' racially hostile work environment, for its malicious and reckless conduct described above, in amounts to be determined at trial.

G.	Grant such further relief as the Court deems necessary and proper in the public interest.

H.     Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its complaint.

DATED this 6th day of September, 2016.

        Respectfully submitted,

        US EQUAL EMPLOYMENT OPPORTUNITY
        COMMISSION

        P. DAVID LOPEZ
        General Counsel

        JAMES L. LEE
        Deputy General Counsel

        GWENDOLYN YOUNG REAMS
        Associate General Counsel

        US Equal Employment Opportunity Commission
        131 M Street, NW
        Washington, D.C.  20507

        LYNETTE A. BARNES
        Regional Attorney

        KARA G. HADEN
        Supervisory Trial Attorney

        **s/ Rachael S. Steenbergh**
        Rachael S. Steenbergh
        (Federal Bar No. 10867)
        Trial Attorney
        UNITED STATES EQUAL EMPLOYMENT
        OPPORTUNITY COMMISSION
        Charlotte District Office
        129 W. Trade Street, Suite 400
        Charlotte, NC 28202
        Tel: (704) 954-6472
        Fax: (704) 954-6412
        Email: Rachael.steenbergh@eeoc.gov

        **ATTORNEYS FOR PLAINTIFF**